Filed 8/12/15  People v. Williams CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B253754 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA078583) |
| v. | |
| DAVON LEE WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig J. Mitchell, Judge.  Affirmed in part, reversed, stricken, and vacated in part, and remanded with directions.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Davon Lee Williams appeals from the judgment entered following his convictions by jury on count 1 – conspiracy to murder, two counts of attempted willful, deliberate, and premeditated murder of a peace officer (counts 2 & 3), two counts of assault with a semiautomatic firearm upon a peace officer (counts 4 & 6), two counts of assault with a firearm (counts 5 & 7), and on count 10 – possession of a firearm by a felon, with findings as to each above count appellant committed the offense for the benefit of a criminal street gang, and findings as to counts 2 through 7 a principal personally used a firearm. (Pen. Code, §§ 182, subd. (a)(1), 186.22, subd. (b)(1)(C), 187, 245, subds. (d)(1) & (2), 664, subds. (a), (e) & (f), 12021, subd. (a)(1), 12022.53, subds. (b) & (e)(1).) The court stated it sentenced appellant to prison for 71 years 4 months to life. We affirm the judgment in part, reverse it in part, strike certain enhancements, vacate appellant's sentence, and remand for resentencing with directions.

## FACTUAL SUMMARY

The evidence, the sufficiency of which is undisputed, established as follows. On November 30, 2009, appellant, Eric Sean Brown, Jr., and Ray Houston[1] conspired to murder rival gang members (count 1). Hevert Zamora (a paid informant given immunity at trial) told deputies about the conspiracy. Los Angeles County Sheriff's Deputy Jorge Juarez testified that about noon on November 30, 2009, he conducted a traffic stop of a black Mercedes at 105th and Vermont because he had been told an occupant possibly possessed a weapon. Zamora was driving the Mercedes. A second man, holding a gun, exited the car and fled. Zamora testified he had a black four-door Mercedes.

---

[1] Appellant, Brown, and Houston were jointly tried. Brown and Houston filed a separate appeal (B243489). On May 5, 2015, this court, on its own motion, consolidated the appeal of Brown and Houston with the present appeal (B253754) for purposes of oral argument and decision, and this court ordered the appeals would keep their separate case numbers.

2

On November 30, 2009, Los Angeles County Sheriff's Deputies Ronnie Perez and George Sakabu were told to conduct a traffic stop of a Lincoln. They saw it about 8:30 p.m. when they were near 106th and Normandie. The Lincoln eventually stopped at 107th and Normandie.

Appellant, Houston, and Brown exited the Lincoln and engaged in a shootout with the deputies. Appellant thus committed attempted willful, deliberate, and premeditated murder of Perez (count 2) and Sakabu (count 3), assault with a semiautomatic firearm against Perez (count 4) and Sakabu (count 6), and assault with a firearm against Perez (count 5) and Sakabu (count 7). Appellant also thus committed possession of a firearm by a felon (count 10). Appellant presented no defense evidence.

## ISSUES

Appellant claims (1) the trial court erroneously denied two *Wheeler*[2] motions, (2) his convictions on counts 5 and 7 must be reversed, and (3) the trial court erroneously imposed, on each of counts 2 and 3, a 20-year enhancement pursuant to Penal Code section 12022.53, subdivisions (c) and (e)(1). Respondent claims this case should be remanded for resentencing and sentencing clarification as to numerous issues and to permit the trial court to correct multiple errors in its sentencing minute order and in the abstract of judgment. In a supplemental letter brief, appellant claims (1) the trial court erred and violated his right to due process by excluding evidence of a 911 call, and (2) Penal Code section 186.22, subdivision (b)(1)(C) gang enhancements on counts 4 through 7 must be reduced to subdivision (b)(1)(B) enhancements.

---

[2] *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). Subsequent references to *Wheeler* are to *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*) as well.

## *DISCUSSION*

1. *The Court Properly Denied the Wheeler Motions.*

    a. *Pertinent Facts.*

        (1) *Juror 13.*

During voir dire of prospective jurors (hereafter, juror(s)), Juror 13 testified as follows. Juror 13, who did "billing at a non-profit organization," lived in Inglewood with her husband. She would give the parties a fair trial.

The prosecutor asked what type of non-profit work Juror 13 did. Juror 13 replied, "We have young children who have mental mishaps in the home or maybe in the schools . . . ." Juror 13 also testified as follows. Juror 13 did not work with the children but was the billing person who helped the therapist who worked with them. Juror 13 had been doing this for 10 years. Previously, Juror 13 attended school while "working at the courthouse for civil harassment." Civil harassment was for "women and children who maybe have had a spouse or boyfriend that's been abusive in the home." The civil harassment work was "more paralegal" and her current billing work was "more the social worker." Juror 13's husband previously had been a substance abuse counselor for 25 years, and that was "also like a social worker sort of setting."[3]

        (2) *Juror 18.*

Juror 18 testified as follows. Juror 18's occupation was "public health research evaluation, specifically in the areas of HIV risk reduction and substance abuse treatment." He had jury experience based on a vandalism-related case about a year before and the case settled. He would be a fair juror.

---

[3]    Juror 13 also testified as follows. There were gangs where Juror 13 lived, but she was not affiliated with any of them. Juror 13 had heard shootings, had heard "a lot of problems," and had "seen a lot of problems with the gangs as far as drugs and police coming around." The words "gangs" did not bother Juror 13, because she had not experienced problems with them. The following occurred: "[The Prosecutor]: So you don't have a negative view. [¶] The Court: I don't think that's what she's saying. Please explore further. [¶] Ma'am, are you a supporter of street gangs? [¶] [Juror 13]: I am not supporting street gangs, if that's what you wanted to know."

4

Juror 18 also testified as follows. Juror 18 had a brother who had been arrested "easily 25 years ago" and charged with unlawful sexual contact with a 17-year-old girl. The brother was now a "registered offender," "and there were some problems that came out with that." The prosecutor asked what the problems were. Juror 18 replied, "Well, again, and this case isn't about sexual expression. But there were some things related to the fact that a 20-year-old man and a 17-year-old girl, she made some accusations. And if you were in the videotape, it's kind of hard to say, well, didn't happen." (*Sic*.)

The prosecutor asked if Juror 18 "had any bad taste in [his] mouth because of the judicial system." Juror 18 replied, "Not as far as the judicial system, but in regards to some of those types of dynamics." The prosecutor asked what type of dynamics, and Juror 18 replied, "I'm talking about dynamics between consenting and nonconsenting age appropriate partners. But I don't see that that's pertinent for this."

(3) *The First Wheeler Motion and Juror 13.*

Later, the prosecutor exercised a peremptory challenge as to Juror 13.[4] At sidebar, Brown, appellant's codefendant, made a *Wheeler* motion on the ground the prosecutor had challenged Juror 13 based on her race.[5] The trial court stated, "I don't believe a prima facie case has been established. [¶] But for purposes of appellate record, I would ask [the prosecutor], so that this does not become an issue, if you simply reply." (*Sic*.) The prosecutor tendered explanations pertaining to (1) the nature of the employment of Juror 13 and her husband, (2) Juror 13's alleged indifference towards gangs, and (3) her alleged conduct at sidebar with the court and all counsel during voir dire. The court later stated, "Apart from that last justification, I do find that there is a plausible explanation for excuse that does not violate the dictates of *Wheeler*. Consequently, that motion is denied." Appellant never joined in Brown's *Wheeler* motion.

---

[4]    The reporter's transcript reflects the challenge as a challenge to Juror 2. The subsequent discussion of the parties and court demonstrate this was Juror 13. We continue to refer to the juror as Juror 13.

[5]    Respondent concedes, and we assume, Juror 13 was an African-American.

(4) *The Second Wheeler Motion and Juror 18.*

Later, the prosecutor challenged Juror 18.[6] At sidebar, Brown made a second *Wheeler* motion, indicating Juror 18 was the second African-American juror whom the prosecutor had challenged. The court commented, "Again, for appellate purposes, if you could Mr. [Prosecutor]. [¶] I am not finding a prima facie case. I have heard answers from this juror that I believe would justify an excuse for a lawful exercise of a peremptory challenge, . . ."

The prosecutor indicated Juror 18's responses to some of the court's questions had been guarded and slow. The court stated, "and, . . . just for the record," Juror 18 had indicated he obviously did not believe his brother had been treated fairly concerning the charge resulting in his brother having to register as a sex offender for life following what seemed to be a consenting relationship between a 20-year-old and a 17-year-old. The court observed that that was the basis for the court's statement that no prima facie case had been made.

The prosecutor later indicated as follows. The prosecutor had reviewed Facebook during the noon hour. "Juror 18 was "essentially . . . an academic. He works at U.C.L.A. He's an account project lead for different health projects, but they seem to focus entirely, almost exclusively, everything I looked on the Internet, dealing with the African-American community." (*Sic*.) Juror 18 appeared to be a "co-author or deals with HIV risk behavior." (*Sic*.) The court stated, "This is making no headway with me at all, Mr. [Prosecutor]."

The prosecutor then stated, "Some of the studies that he has been on also expresses dealing with individuals that are incarcerated or have spent time in jail. [¶] The way it's couched in this paper, that these individuals are faced with structural behaviors that causes them to be engaged in many such behaviors. [¶] So I think he

---

**6** The reporter's transcript reflects the challenge as a challenge to Juror 2. The subsequent discussion of the parties and court demonstrate this was Juror 18. We continue to refer to the juror as Juror 18.

is . . . entirely focused on a certain group, and because of socioeconomic or cultural factors . . . that the society is essentially placing them in situations where they have to take greater risks." (*Sic*.) The prosecutor continued, "I think that because this is a gang situation, he would have the same similar sociological views where gangs are operating . . . not that these individuals are making choices, but that they are forced into situations." (*Sic*.)

The following then occurred: "The Court: I understand. [¶] I don't personally agree with the final conclusion that you have made, but I agree with a race-neutral and a lawful justification for the excuse. [¶] [Brown's Counsel]: It would just seem to me, based upon what [the prosecutor] said, and I don't want to get anybody in trouble, because I'm sure he's not exercising it because of any animus that he would bring, the fact that he is Black, studies African-Americans as the basis -- [¶] [The Prosecutor]: I never once said that he's – that it's because he's Black. [¶] The Court: That's not a complete representation of what [the prosecutor] has just explained as his assessment of his academic research and the material that he has written." The court denied the second *Wheeler* motion. Appellant never joined in Brown's second *Wheeler* motion.

    b. *Analysis.*

        (1) *Appellant Waived His Wheeler Claims*.

Appellant claims the trial court erroneously denied the two *Wheeler* motions. The claim is unavailing. Brown made the motions, not appellant, and appellant never joined in them. As to each, appellant has failed to preserve for review the issue of whether denial of the motion was error. (Cf. *People v. Avila* (2006) 38 Cal.4th 491, 553; see *People v. Morrison* (2004) 34 Cal.4th 698, 710 (*Morrison*) ["[f]or all we know, counsel stood silent because (1) they saw no legitimate basis for a *Wheeler*/*Batson* claim given their knowledge and observations of the excused jurors and/or (2) they themselves found one or more of the jurors objectionable from a defense standpoint."].)

7

(2) *The Wheeler Motions Were Without Merit.*

(a) *Applicable Law.*

In *Wheeler*, *supra,* 22 Cal.3d 258, our Supreme Court stated, "[w]e conclude that the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution." (*Wheeler,* at pp. 276-277.) *Batson* reached the same conclusion based on the federal equal protection clause. (*People v. Huggins* (2006) 38 Cal.4th 175, 226.)

When a defendant asserts at trial the prosecution's use of peremptory challenges violates the federal Constitution because they are based on race, the defendant must make out a prima facie case by showing the totality of the relevant facts gives rise to an inference of discriminatory purpose. The burden then shifts to the State to explain adequately the race exclusion by offering permissible race-neutral justifications for the challenges. Thereafter, if a race-neutral explanation is tendered, the trial court must decide whether the opponent of the challenge has proven purposeful racial discrimination. The identical three-step procedure applies when the challenge is brought under the California Constitution. (*People v. Cowan* (2010) 50 Cal.4th 401, 447.)

Moreover, in *People v. Scott* (2015) 61 Cal.4th 363 (*Scott*), our Supreme Court stated, "where (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson*/*Wheeler* motion with a review of the first-stage ruling. [Citations.] If the appellate court agrees with the trial court's first-stage ruling, the claim is resolved." (*Id.* at p. 391, fn. omitted.) A somewhat different analysis (inapplicable here) applies if "the prosecutor provides a reason that is discriminatory on its face." (*Id.* at p. 392.)

8

Further, concerning appellate review of a trial court's first-stage ruling, "When the trial court expressly states that it does not believe a prima facie case has been made, and then invites the prosecution to justify its challenges for the record on appeal, . . . we sustain the trial court if, upon independently reviewing the record, we conclude the totality of the relevant facts does not give rise to an inference of discriminatory purpose. [Citation.]" (*People v. Howard* (2008) 42 Cal.4th 1000, 1018.)

Further still, "When a trial court denies a motion under *Wheeler*, . . . after finding no prima facie case of group bias, we consider the entire record of voir dire for evidence to support the trial court's ruling. If the record suggests grounds upon which the prosecutor might reasonably have challenged the prospective jurors in question, we affirm." (*People v. Yeoman* (2003) 31 Cal.4th 93, 116.) However, *Scott* observed, "a reviewing court may not rely on a prosecutor's statement of reasons to *support* a trial court's finding that the defendant failed to make out a prima facie case of discrimination." (*Scott*, *supra*, 61 Cal.4th at p. 390.)

In the present case, the trial court effectively denied each *Wheeler* motion based on alternative rulings, i.e., a first-stage ruling Brown did not make out a prima facie case, and a third-stage ruling he did not prove purposeful discrimination. (See *Scott, supra*, 61 Cal.4th at pp. 385-386, 391.) The prosecutor's tendered justifications were nondiscriminatory; therefore, we begin our analysis of the trial court's denial of each *Wheeler* motion with a review of the trial court's first-stage ruling.

(b) *The Court Did Not Err by Denying the First Wheeler Motion.*

Even if the issue of whether the trial court erroneously denied the first *Wheeler* motion was preserved for review, we, for the following reasons, reject on the merits appellant's claim the trial court erroneously denied that motion. Juror 13 was employed by a non-profit organization that worked with "young children who have mental mishaps," and she was the billing person who helped the therapist. Employment in youth services provides a race-neutral ground for a challenge (*People v. Jones* (2013) 57 Cal.4th 899, 918 (*Jones*)) as does a juror's connection with providing health care or

9

social services.  (*People v. Rushing* (2011) 197 Cal.App.4th 801, 811-812 (*Rushing*).)  Juror 13 testified her billing work was "more the social worker."  Employment as a social worker provides a race-neutral basis for a challenge.  (*People v. Mai* (2013) 57 Cal.4th 986, 1053.)

Moreover, Juror 13's husband had been a substance abuse counselor for 25 years, and Juror 13 testified that was "also like a social worker sort of setting."  Employment in a caregiving field provides a race-neutral basis for a challenge (cf. *People v. Perez* (1996) 48 Cal.App.4th 1310, 1315) as does employment as a social worker.  The occupation of a juror's spouse can provide a race-neutral basis for a challenge.  (*Rushing*, *supra,* 197 Cal.App.4th at pp. 811-812.)  As to the first *Wheeler* motion, Brown failed to make a prima facie case; therefore, the trial court did not err by denying the motion.

(c) *The Court Did Not Err by Denying the Second Wheeler Motion.*

Even if the issue of whether the trial court erroneously denied the second *Wheeler* motion was preserved for review, we, for the following reasons, reject on the merits appellant's claim the trial court erroneously denied that motion.  Juror 18's brother had been charged with unlawful sexual contact with a 17-year-old girl and, as a result, Juror 18's brother was a registered sex offender.  Juror 18's comments implied he had a "bad taste in his mouth" regarding the "dynamics between consenting and nonconsenting age appropriate partners."

The trial court indicated Juror 18 obviously did not believe his brother had been treated fairly concerning the matter, and the court indicated that was the reason it had concluded Brown had failed to make a prima facie case.  A family member's negative experience with the criminal justice system provides a race-neutral reason for a challenge.  (*Jones, supra,* 57 Cal.4th at p. 920.)  As to the second *Wheeler* motion, Brown failed to make a prima facie case; therefore, the trial court did not err by denying the motion on that ground.

Appellant asserts the prosecutor, explaining his challenge of Juror 18, "specifically stated [Juror 18's] work with African-Americans was the problem."  Appellant also

10

asserts the prosecutor "struck [Juror 18] because his work was focused on African-Americans" and "[t]he prosecutor said he excused [Juror 18] . . . because his academic projects focused on the African-American community." Appellant, by his assertions, is really arguing the prosecutor's explanation for challenging Juror 18 shows the challenge was based on purposeful discrimination, and the trial court erred in its third-stage ruling to the contrary. Even if we review the trial court's third-stage ruling, we reject appellant's assertions and argument for the reasons discussed below.

The prosecutor's explanation, fairly read as a whole, indicated he had determined Facebook reflected Juror 18 was a UCLA academic who had been involved in studies dealing with incarcerated African-Americans. The prosecutor further explained that "the way it's couched in [Juror 18's] paper" (suggesting a reference to an academic paper authored by Juror 18), such inmates were faced with structural behaviors that caused inmate behavior.

The prosecutor indicated that, as a result, the prosecutor thought (1) Juror 18 was entirely focused on a certain group and (2) Juror 18 believed that, because of socioeconomic or cultural factors, society was placing the group members in situations where they had to take greater risks. The prosecutor further indicated he thought that, because the present case was a gang case, Juror 18 would have the same sociological views concerning gangs, including a view that gang members were not making choices but were forced into situations.

In other words, the prosecutor was not discussing his state of mind concerning race, but indicating that based on information about Juror 18 on Facebook, the prosecutor had concluded (1) *Juror 18's* state of mind was that society *caused* African-American inmates to act certain ways (and, as a corollary, said inmates had diminished responsibility) and (2) *Juror 18* would import that view into the present gang case. The court declined to agree with the prosecutor's "final conclusion," but none of the defendants or the court disputed the accuracy of the prosecutor's representations as to the

11

fact, or content, of information about Juror 18 on Facebook, i.e., the predicate for the prosecutor's conclusions.

"For a third stage *Batson/Wheeler* inquiry, '[r]eview of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions.' [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 847.) The prosecutor's explanation provided substantial evidence no purposeful discrimination occurred when he challenged Juror 18. The trial court did not err by denying the second *Wheeler* motion on the ground Brown failed to prove purposeful discrimination.

2. *Appellant's Convictions for Assault with a Firearm (Counts 5 & 7) Were Improper.*

Appellant claims he could not be convicted of assault with a firearm upon Perez (count 5) and assault with a firearm upon Sakabu (count 7), because those offenses were lesser included offenses of assault with a semiautomatic firearm upon Perez (count 4) and assault with a semiautomatic firearm upon Sakabu (count 6), respectively. Appellant is correct (*People v. Martinez* (2012) 208 Cal.App.4th 197, 199) as respondent concedes. We will reverse appellant's convictions on counts 5 and 7 and dismiss those counts. (Cf. *People v. Ortiz* (2002) 101 Cal.App.4th 410, 415, 417; *People v. Contreras* (1997) 55 Cal.App.4th 760, 762, 765.)

Moreover, because the trial court may have wanted appellant's total prison sentence to be greater than would be the case if we merely reversed appellant's convictions on counts 5 and 7 and dismissed those counts, we will vacate appellant's entire sentence and remand for resentencing. (Cf. *People v. Stevens* (1988) 205 Cal.App.3d 1452, 1455-1458.)

3. *The Penal Code Section 12022.53, Subdivision (c) Enhancement as to Each of Counts 2 and 3 Must Be Stricken.*

The information alleged, inter alia, as to each of counts 2 and 3 that a principal personally and intentionally discharged a firearm for purposes of Penal Code section 12022.53, subdivisions (c) and (e)(1). However, the jury found "false" those allegations. Nonetheless, during the January 14, 2014 sentencing hearing, the trial court orally

12

imposed, on each of those counts, a 20-year enhancement pursuant to section 12022.53, subdivisions (c) and (e)(1).

Appellant claims, inter alia, imposition of the enhancements was error. We agree. The trial court could not properly impose the enhancements because their predicate allegations were neither admitted nor found true. (Pen. Code, §§ 1170.1, subd. (e), 12022.53, subd. (j).) Respondent concedes the error. We will strike said 20-year enhancements. Moreover, the parties concede remand for resentencing on this issue is appropriate. We accept the concession and we will remand for resentencing.[7] We express no opinion concerning what appellant's new sentence, or any of its components, should be.

4. *The Trial Court Did Not Err by Excluding the 911 Call.*

a. *Pertinent Facts.*

On March 5, 2012, during trial, Houston filed a motion to admit into evidence a 911 call. Attached to the motion was a call transcript reflecting that at 6:25 p.m. on November 25, 2009, the following occurred. The dispatcher asked what was the caller's emergency and the caller indicated "there was some gun shots." (*Sic*.) The dispatcher asked if the caller saw anything, and the caller replied, "Between 104th and 105th on Normandy." A "second caller" said, "I'm really between 104th and 106th." The "caller" said, "Yeah."

---

[7]    Respondent argues the court committed similar sentencing error regarding counts 4 through 7. Moreover, the parties concede imposition of a 10-year enhancement as to each of counts 2 and 3 pursuant to Penal Code section 12022.53, subdivisions (b) and (e)(1) is proper. Since we are remanding the matter for resentencing, the trial court can deal with all these issues following remand. Further, as previously mentioned, respondent claims this case should be remanded for resentencing and sentencing clarification as to numerous issues and to permit the trial court to correct multiple errors in its sentencing minute order and in the abstract of judgment. Appellant argues in this connection, inter alia, the trial court erroneously imposed a total prison sentence of 71 years 4 months, and the case should be remanded to permit the trial court to impose what he claims is the correct sentence, i.e., 61 years 4 months. The trial court can deal with these issues following remand.

13

The following then occurred: "Dispatcher: Did you see anybody? Did you hear? How many shots did you hear? [¶] Caller: Yeah we heard two shots and then someone riding in a black car, what kind of car was it? A black car. [¶] Dispatcher: Black car, two doors or four doors do you remember? [¶] Caller: Four doors." After the caller provided information as to which way the black car went, the dispatcher asked if that was all the caller saw and the caller indicated yes.

In the written motion, Houston argued, inter alia, as follows. Zamora, an informant, was the only person identifying the shooter of Charles Dwain,[8] and/or identifying the shooter's accomplices, and Zamora drove a black, four-door Mercedes. The 911 call was admissible to show Zamora was "right there at the scene, as either a witness, and/or a participant, in said homicide." The call was also admissible on the issue of the credibility of Zamora and the investigating deputies, and the call impacted Houston's ability to present his theory of defense. The Evidence Code section 1240 spontaneous statement hearsay exception applied to the call.

During argument at the March 7, 2012 hearing on the motion, the prosecutor argued the spontaneous statement hearsay exception did not apply because the caller's statement was not given under the stress of excitement, there was no evidence where the caller was at the time of the call, and the call occurred late at night when all cars could appear to be dark.

After the court listened to the tape of the 911 call, the court stated, "[i]t will not be admitted for the very following easy reason: [¶] The caller who is talking to the 911 operator has to ask somebody else about what kind of car it was and the color of the car. And so we have two layers of hearsay. [¶] And it was absolutely critical, and I kept replaying that same very critical sentence where in the transcript it reads, 'Yeah, we heard two shots and then someone riding in a black car, what kind of car was it?' [¶]

---

[8]    Unlike Williams, Brown and Houston were also tried for the November 25, 2009 shooting and murder of Dwain. Brown was convicted, and Houston was acquitted, of the murder.

14

Even the first 'black car,' there is a hesitation by the speaker where the female speaker is clearly inquiring of someone else. [¶] And that explains why she follows up, after that person again reiterates what color of car it was, it is identified as a black car. So it simply is not admissible because 1240 does not permit multiple layers of hearsay in a spontaneous declaration."[9] Appellant did not join in Houston's effort at trial to introduce evidence of the 911 call.

b. *Analysis.*

Appellant presents related claims the trial court erred, and violated his right to due process, by excluding the 911 call on the grounds the call was hearsay and the Evidence Code section 1240 spontaneous statement hearsay exception was inapplicable. We conclude otherwise. Appellant forfeited review of the issues by his failure to attempt to introduce the 911 call into evidence and failure to join in Houston's effort at trial to do so. (Evid. Code, § 354, subd. (a); see *Morrison, supra,* 34 Cal.4th at pp. 711-712; *People v. Ramos* (1997) 15 Cal.4th 1133, 1178.)

Even if appellant did not forfeit review of the issues, we reject appellant's claims on their merits. Evidence Code section 1240 states, "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made

---

[9] Following Houston's conviction by jury on various counts, he moved for a new trial, in part on the ground the trial court erred by excluding the 911 call. At the September 26, 2012 hearing on the motion, the court stated, inter alia, "This was . . . thoroughly litigated . . . during the trial. I took a very close look at the 911 call. I went back into chambers. I listened to it over and over again. It was extremely clear to me that the information being relayed by the declarant in that 911 call was secondhand information at best. [¶] Consequently, the provisions of Evidence Code 1240 do not permit the admissibility of that representation. . . . We may have multiple . . . layers of hearsay. But clearly the declarant and their reference to a black vehicle did not and was not representing what they personally witnessed." (*Sic*.) The court indicated the hearing on the new trial motion had been continued several times, on each new date the court reviewed the matter, and the court's ruling was "the product of an extraordinary amount of time reflecting on the fairness of Mr. Houston's trial." The trial court denied Houston's new trial motion.

15

spontaneously while the declarant was under the stress of excitement caused by such perception." An appellate court applies an abuse of discretion standard of review to any ruling by a trial court on whether a hearsay exception applies. (*People v. Martinez* (2000) 22 Cal.4th 106, 120.) Moreover, we review the trial court's ruling, not its reasoning. (Cf. *People v. Mason* (1991) 52 Cal.3d 909, 944.)

Fairly read, the record of the March 7, 2012 proceedings reflects the trial court listened to the 911 call and concluded as follows. According to the transcript of the 911 call, at one point the caller stated, "Yeah we heard two shots and then someone riding in a *black car*, what kind of car was it? A *black car*." (Italics added.) However, in connection with the caller's first above italicized reference to the black car, the caller hesitated and asked a second person what kind of car it was and its color. The second person replied it was a black car. The caller followed up with the question "what kind of car was it?" The second person reiterated the car was black, and the caller then again identified it as a black car (the second above italicized reference) to the dispatcher. The call involved multiple hearsay.

In sum, after considering the transcript and tape of the call, the trial court concluded that the caller, speaking to the dispatcher, twice referred to the car as a black car, and each such hearsay reference was in turn based on hearsay, i.e., the second person telling the caller the car was a black car.

We also note the call was ambiguous. After the caller indicated there were gunshots, the dispatcher asked if the caller saw anything, and the caller replied, "Between 104th and 105th on Normandy." That vague reply did not make clear whether the quoted location was (1) where the caller was when the caller saw something, (2) where the caller was at the time of the call, (3) where shots were fired, and/or (4) where something else occurred. Moreover, the caller did not clearly indicate when or where gunshots were fired, where the caller was when the caller heard gunshots, or how much time passed from the time the caller heard gunshots to the time of the call. Nor, for that matter, did the caller clearly indicate the relationship between the gunshots and the black car,

16

including, e.g., whether the black car was merely in the vicinity of the gunshots, and/or whether shots were fired from, and/or at, the black car. The trial court later observed the caller was not relating the caller's personal observations.

Similarly, the caller's reply, "Between 104th and 105th on Normandy," did not make clear whether that location was where the second person was at the time of the gunshots, at the time of the call, and/or at some other time, and the call did not clearly indicate where the second person was when the gunshots occurred, and/or how much time passed, if any, from the time the second person heard gunshots to the time of the call.

Accordingly, the court reasonably could have concluded neither the caller's statement to the dispatcher, nor the second person's statements to the caller, purported to narrate, describe, or explain an act, condition, or event—the hearing of gunshots— "perceived by the declarant" within the meaning of Evidence Code section 1240. The trial court also reasonably could have concluded neither the caller's statement to the dispatcher, nor the second person's statements to the caller, were, within the meaning of section 1240, "made spontaneously while the declarant was under the stress of excitement caused" by any such perception.

The trial court did not abuse its discretion by excluding the 911 call as inadmissible hearsay as against the argument the Evidence Code section 1240 hearsay exception applied. That some facts might have suggested the trial court could have ruled differently does not compel a contrary conclusion. Moreover, the application of the ordinary rules of evidence, as here, did not impermissibly infringe on appellant's right to due process. (Cf. *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)[10]

---

[10]     As mentioned, in his supplemental letter brief, appellant claims Penal Code section 186.22, subdivision (b)(1)(C) gang enhancements on counts 4 through 7 must be reduced to subdivision (b)(1)(B) enhancements. The trial court can deal with that issue following remand.

17

*DISPOSITION*

The judgment is affirmed, except the 20-year enhancement imposed on each of counts 2 and 3, pursuant to Penal Code section 12022.53, subdivisions (c) and (e)(1), is stricken, appellant's two convictions for assault with a firearm (counts 5 and 7) are reversed and counts 5 and 7 are dismissed, appellant's sentence is vacated, and the matter is remanded for resentencing consistent with this opinion. The trial court is directed to correct its sentencing minute order and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, Acting P. J.

We concur:

ALDRICH, J.

JONES, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.